## UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Docket no. 2:12-cr-0065-NT |
| BRUNEL CONSTANT | ) | |
| | ) | |

### OPINION AND ORDER
### ON MOTIONS TO SUPPRESS

Defendant Brunel Constant ("**Defendant**") is charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). This case comes before the Court on Defendant's motions to suppress both the firearm recovered by police under a porch eave and witness identifications of the Defendant. For the reasons discussed below, the Defendant's motion to suppress the firearm (ECF No. 30) is **DENIED** and his motion to suppress witness identifications (ECF No. 29) is **GRANTED IN PART** and **DENIED IN PART**.

### FINDINGS OF FACT

The charge against the Defendant arises out of a shooting incident that occurred in the pre-dawn hours of August 19, 2011 outside a three-story, six-unit apartment building on Walnut Street in Lewiston, Maine. The Walnut Street apartment building contained two apartments on each floor. The pertinent residents of the building were Alan Roy and his girlfriend, Tanya Chickering, who lived in one of the apartments on the third floor; Roy's mother, Jeannette Cloutier, and his sister, Nancy Cote, who lived in one of the first floor apartments; and Ronald Coleman, who lived in the other first floor apartment.

On the night in question, Roy was with his friend Adam Dennis. The two had finished work, purchased beer, and spent the evening hanging out on Walnut Street. At about 4:00 a.m., Dennis was preparing to head home when he noticed a man sleeping on the back porch of Jeanette Cloutier and Nancy Cote's apartment. Dennis woke the man, intending to get him to move along, and an argument ensued.

During the argument, the man mentioned something about Nancy owing him money. Dennis and the man moved from Cloutier's back porch through a lighted hallway to the front porch. After several minutes of arguing, the man departed. Roy witnessed the argument but did get involved. Ronald Coleman, who was inside his first floor apartment, did not observe the encounter but heard a man yell certain expletives and claim that he would be back.

After the man left, Roy returned to his apartment and Dennis went home. Shortly thereafter, still prior to dawn, Roy was eating a bowl of chili when he heard shouting outside. Roy took a brief look out of his window and saw that the man who had been on his mother's porch had returned. Not wanting to get involved, Roy retreated into his apartment, and moments later he heard, but did not see, gun shots. Dennis, who was home by the time of the shooting, testified that Roy called him to let him know that the man from the argument had returned with a gun.

The man fired two shots from the street toward the front of Cloutier's apartment. Coleman heard the first shot and looked out his front window in time to see a blaze from the gun as the second shot was fired. Based on the repercussion

from the shot, the fire length, the lack of a sound of casings hitting the street, and his knowledge of guns, Coleman surmised that the gun was a revolver. Coleman observed that the shooter was aimed at Cloutier's apartment, and he saw the shooter turn and walk away after firing the second shot. Coleman did not see the shooter's face, but he observed that the shooter was a black man with long dreadlocks wearing a white tank top.

Later that morning, Lewiston Police Department Officer Derrick St. Laurent picked up the investigation of the shooting. Officer St. Laurent's[1] supervisor provided an initial description of the shooter as a black male with dreadlocks and wearing a white tank top. Officer St. Laurent spoke with Cloutier, who did not witness the shooting but who was woken up by the shots to her residence, and he also interviewed Roy and Chickering.

Roy claimed to recognize the man who had been on his mother's porch as someone he had seen around Lewiston, but whose name he did not know. After making some inquiries, Roy contacted Officer St. Laurent and told him that the man was called "Jamal" and that he lived with a girl named Temesha on Bradley Street between Pine and Ash Streets. Officer St. Laurent canvassed that area and learned that a man fitting the description lived with his girlfriend in a second-floor apartment at a particular building on Bradley Street.

Officer St. Laurent and three other officers, Special Agent Douglas Kirk, Detective James Theiss, and Detective Roland Godbout, approached the apartment building together. Special Agent Kirk testified that he a mailbox marked "Temesha

---

[1]     Officer titles are retained to identify government actors.

Blackwell." The officers rang the bell to Blackwell's apartment, but nothing happened. Some neighbors told the officers that the tenants generally entered their apartment through the entrance around the back.

The two-story building contained at least two apartments.[2] The apartments had front doors on the first floor and back doors which exited onto a second floor porch that led to a set of wooden stairs down the back side of the building. Detective Godbout initially remained outside of the front of the Bradley Street building while Officer St. Laurent, Special Agent Kirk and Detective Theiss climbed the wooden staircase attached to the back of the building that led to the back doors of both apartments.

As the officers approached the second floor landing, a black man with long dreadlocks wearing a white tank top emerged from one of the apartment doors. Officer St. Laurent, who was first up the stairs, greeted the man, and the man asked him what was going on. Officer St. Laurent asked the man if anyone else was in the apartment, and the man answered that his girlfriend was inside sleeping on the couch. Officer St. Laurent asked if the man minded if he spoke with her; the man said "no," and Officer St. Laurent then entered the apartment. By this time, Detective Godbout had come around from the front, and he entered the apartment along with Officer St. Laurent, while Special Agent Kirk and Detective Theiss stood with the man on the back stairway.

---

[2]        Blackwell's testimony about the layout of the building is confusing. Blackwell described her apartment as an area by the front door on the first floor which leads to a stairway to her apartment. She stated that next to her on the second floor was another apartment, but she did not know whether that apartment also had living space on the first floor. It is possible that there was a third apartment on the first floor.

Detective Theiss conversed with the man on the back porch and eventually succeeded in obtaining a Massachusetts identification listing the man as the Defendant, Brunel Constant. Detective Theiss called the Defendant's name in to a dispatcher and learned that there was a warrant out for the Defendant's arrest. Detective Theiss and Special Agent Kirk placed the Defendant under arrest and waited for other officers to arrive to transport the Defendant back to the police department.  Approximately 15 to 20 minutes elapsed from the first encounter with the Defendant until he was taken to the police station.

The police did not reveal to the Defendant that they were investigating a shooting and looking for a gun. Special Agent Kirk testified that once they found out that there was a warrant for the Defendant's arrest, they knew that taking the Defendant to the police station would allow the investigators a better opportunity to talk to the Defendant. Officer St. Laurent testified that he did not tell the Defendant that they were looking for a gun because he wanted the nature of their investigation to be a surprise to the Defendant at any subsequent interrogation.

While Detective Theiss and Special Agent Kirk were speaking with the Defendant outside, Officer St. Laurent and Detective Godbout went inside and talked to the Defendant's girlfriend, Temesha Blackwell. Blackwell told Officer St. Laurent and Detective Godbout that she lived in the apartment with her son and that the Defendant was a boyfriend from Boston who occasionally stayed with her. Blackwell stated that when the Defendant did stay over, he slept on the couch or with her. Detective Theiss testified that he asked who was on the lease, and

Blackwell said that it was just her. Blackwell gave consent to search the apartment. She testified that she did not have a problem with the search because she had nothing to hide. The officers searched the apartment and Detective Theiss ultimately found a revolver outside the apartment in the rafters on the back porch.

Blackwell admitted at the suppression hearing that she did not tell the officers that she had moved into the apartment with the Defendant approximately two months prior or that he had paid the both the security deposit and the rent on the apartment since that time.

After the Defendant's arrest, Officer St. Laurent asked Detective Wayne Clifford to put together a photo array with the Defendant's photograph. Detective Clifford provided Officer St. Laurent with a photographic array containing six pictures. All of the individuals depicted in the array are black men with dreadlocks, and all appear to be approximately between the ages of 18 and 40. The Defendant, however, is the only individual in the array with dreadlocks extending well below his shoulders. The Defendant is also the only individual in the array wearing a white tank top. The other individuals all have short dreadlocks and either orange or white tops with sleeves. One of the men is also significantly more heavyset than the others. Detective Clifford admitted that he had difficulty compiling the array because there were only five black men with dreadlocks in his database. These men then became the other individuals in the photographic array.

Officer St. Laurent presented this array to Adam Dennis, Alan Roy, Nancy Cote, and Ronald Coleman. Dennis viewed the array the afternoon following the

shooting and identified the Defendant as the man with whom he had argued on Cloutier's porch. At the suppression hearing, Dennis recalled having no difficulty identifying the Defendant at the time the array was presented to him. Roy at first picked out another individual's photo, but then chose the Defendant's photo because he recognized his face. Roy identified the Defendant's photo as the man he had seen on his mother's porch earlier that morning and then back at his mother's apartment again moments before the shooting.[3] Although Nancy Cote did not witness any of the events surrounding the shooting, she was shown the array and pointed out the Defendant as her friend Jamal. Cote testified at the suppression hearing that she did owe the Defendant money.

Due to an oversight, Coleman was not presented with the array until five months after the shooting, at a time when he was in the hospital. Coleman picked out the Defendant's photo without hesitation and evinced certainty in his identification of the Defendant. At the suppression hearing, however, Coleman stated that he actually was not sure of the identification because he had not seen the shooter's face. Coleman stated that he picked out the Defendant's photo because the braids were the same length as the shooter's braids and because he was wearing a white tank top like the shooter. Coleman also understood at the time he viewed the photos that the police had found their man.

---

[3]    Officer St. Laurent testified that he believed that Adam Dennis might have had some difficulty picking out the Defendant, and described Dennis first choosing between two photos, but then settling on the Defendant's photo. He also testified that Alan Roy had no difficulty picking out the Defendant's photo from the lineup. It appears that Officer St. Laurent may have confused Dennis and Roy, both of whom had viewed the array on the same afternoon. The Court credits the testimony of Roy and Dennis in this regard.

# **DISCUSSION**

## A. Suppression of the Firearm

The Defendant contends that the firearm recovered by the police during their August 19, 2011 search of the Bradley Street apartment should be suppressed because the search violated his Fourth Amendment rights. The Court credits Blackwell's testimony that the Defendant rented the apartment and lived in it with her. The Defendant therefore had a reasonable expectation of privacy in the apartment. However, both because Blackwell permitted the search, and because the gun was found outside on a porch accessed by more than one apartment, the search was valid and the fruits of that search will not be suppressed.

### 1.    Consent

There is no violation of the Fourth Amendment's[4] prohibition against unreasonable searches and seizures where a person with authority over the property voluntarily consents to a search. *See Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). A co-occupant may consent to a search of the suspect's premises when the suspect is absent. *Randolph,* 547 U.S. at 109 (citing *United States v. Matlock*, 415 U.S. 164, 170 (1974)). But the consent of a co-occupant is not valid when a co-occupant suspect is also present and objects to the search. *Randolph,* 547 U.S. at 115. Consent of a co-occupant may also not be valid if the police purposefully remove the suspect from the premises for the sake of avoiding an objection. *See id.* at 121.

---

[4]      The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ." U.S. Const. amend. IV.

The Defendant argues that the police purposefully removed him from the premises so that he could not object to the search. The testimony does not support the Defendant's claim. Although the police admitted that they did not want to begin their search while the Defendant was present, Officer St. Laurent explained that this was because they wanted the nature of the investigation to be a surprise to the Defendant at any subsequent interrogation. Special Agent Kirk testified that once the police knew that there was an outstanding warrant for the Defendant's arrest, they were anxious to secure him and bring him to the police station, which was a more favorable location for an interview.

Officer St. Laurent also testified that he did not ask the Defendant for permission to search the premises because he understood that the apartment belonged solely to Blackwell and he understood the Defendant to be an occasional overnight houseguest. Blackwell admitted at the suppression hearing that she understated the Defendant's interest in the apartment when she spoke with the police. Blackwell told the police that the Defendant was a boyfriend from Boston who stayed with her occasionally and either slept on the couch or with her. St. Laurent reasonably relied on Blackwell's statements. The Court is aware that even if he were merely a houseguest, the Defendant may have been able to withhold consent over portions of the apartment where he kept his personal belongings. *Minnesota v. Olson*, 495 U.S. 91, 99 (1990).[5] But the fact that Officer St. Laurent

---

[5]    *Olson* held that houseguests have a legitimate expectation of privacy in the temporary quarters provided by a host. The Court does not here take on the question of whether or the degree to which a houseguest can withhold consent in the face of a host who consents to a search of the host's premises.

9

believed that the Defendant had no right to object to the search of the apartment does support the Government's claim that the police were not trying to remove the Defendant for the purpose of depriving him of an opportunity to object to the search.

The Court finds that the decision to seek Blackwell's consent to search only after the Defendant had been removed was motivated by legitimate law enforcement interests in both securing the premises and preserving a tactical advantage in any later interrogation. Because the police were not removing the Defendant from the premises "for the sake of avoiding a possible objection," the search was reasonable. *See Randolph*, 547 U.S. at 121.

### 2.    No Reasonable Expectation of Privacy

A defendant bears the burden of establishing that "his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Rheault*, 561 F.3d 55, 58-59 (1st Cir. 2009) (quoting *Rakas v. Illinois,* 439 U.S. 128, 131 n.1 (1978)). This requires a defendant to establish that he had a legitimate expectation of privacy in the place searched. The Supreme Court follows "a two-part test for analyzing the expectation question: first, whether the movant has exhibited an actual, subjective, expectation of privacy; and second, whether such subjective expectation is one that society is prepared to recognize as objectively reasonable." *Rheault,* 561 F.3d at 59. (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

The gun was discovered in the rafters on the back porch. Blackwell testified that she and the Defendant were the only tenants who used the back porch. Defense counsel has argued that because this area was used exclusively by Blackwell and

the Defendant and was not used by the occupants of the other second floor apartment, the Defendant had a reasonable expectation of privacy there.

The Court disagrees. Blackwell testified that she knew that the other door off the back porch went to another apartment in the building. Blackwell and the Defendant had been living in the apartment for less than two months. Although Blackwell testified that she never saw occupants from the other apartment enter from the back door or use the porch, this does not confer exclusive control over the porch to Blackwell and the Defendant. There is no evidence that Blackwell and the Defendant had a right to exclude other tenants from the back porch, and they therefore had no reasonable expectation of privacy therein.

Additionally, there was no gate barring access up the back stairs to the back porch or any signage directing people to keep out. Because the area in question is both open to the public and potentially shared by occupants of the second apartment, the Court finds that any subjective expectation of privacy is not objectively reasonable. Neither can the back entryway and porch be considered part of the curtilage of the Defendant's apartment. "In a modern urban multi-family apartment house, the area within the 'curtilage' is necessarily much more limited than in the case of a rural dwelling subject to one owner's control. In such an apartment house, a tenant's 'dwelling' cannot reasonably be said to extend beyond his own apartment and perhaps any separate areas subject to his exclusive control." *United States v. Cruz Pagan*, 537 F.2d 554, 558 (1st Cir. 1976) (citing *Commonwealth v. Thomas*, 267 N.E. 2d 489, 491 (1970)); *see also United States v.*

*Brown*, 169 F.3d 89, 92 (1ˢᵗ Cir. 1999) (no reasonable expectation of privacy in apartment building lobby); *United States v. Hawkins*, 139 F.3d 29, 32-33 (1ˢᵗ Cir. 1998) (no reasonable expectation of privacy in unenclosed shared basement of apartment building).

Both because valid consent to search was given and because, in any event, the gun was found in an area in which the Defendant lacked a legitimate expectation of privacy, the Defendant's motion to suppress the firearm is denied.

### B. Suppression of Witness Identifications

The Defendant contends that the six-photo array that was shown to the witnesses was impermissibly suggestive and tainted the witness identifications of him in violation of his right to due process of law. The Government denies that the array was unnecessarily suggestive and argues that even if the array were to be considered unnecessarily suggestive, the witness identifications were all sufficiently reliable so as to allow their admission.

The Supreme Court has allowed identifications even in cases where only one photograph has been shown to a witness or where a single suspect is brought before a victim for identification if circumstances made such a procedure necessary or there was a sufficient showing that the identification was nonetheless reliable. *See Manson v. Brathwaite*, 432 U.S. 98, 114-116 (1977) (single photo shown to undercover narcotics officer was unnecessarily suggestive but admissible because identification was otherwise reliable where officer saw drug dealer for several minutes in good light, provided a thorough description, and was certain about his

identification); *Neil v. Biggers*, 409 U.S. 188, 198-200 (1972) (single suspect brought before victim was unnecessarily suggestive but identification was reliable because victim saw assailant for considerable period of time under adequate lighting, provided a detailed description before the "show-up," and had no doubt about her identification); *Simmons v. United States*, 390 U.S. 377, 380-86 (1968) (snapshots of bank robbery suspect shown to tellers was not an ideal identification procedure but was "not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"); *Stovall v. Denno*, 388 U.S. 293, 302 (1967) (single suspect "show-up" at victim's hospital bedside was suggestive but necessary given concern that victim might die).

"An out-of-court identification based on a photo array must be suppressed as a matter of due process 'only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification.'" *United States v. Holliday*, 457 F.3d 121, 125 (1st Cir. 2006) (quoting *Biggers*, 409 U.S. at 197). The analysis proceeds in two steps: (1) determining whether the array was impermissibly suggestive; and (2) if the array was impermissibly suggestive, determining whether the witness's identification was nevertheless sufficiently reliable under the totality of the circumstances to be allowed into evidence. *Holliday*, 457 F.3d at 125 (citing *United States v. Henderson*, 320 F.3d 92, 100 (1st Cir. 2003)). "The standard being applied is meant to screen out only evidence that is clearly unreliable and not to supplant the jury's ordinary function of weighing what the witness says and choosing the weight to accord it. It

is for this reason that 'it is only in extraordinary cases that identification evidence should be withheld from the jury.'" *United States v. Jones*, 689 F.3d 12, 18 (1st Cir. 2012) (quoting *United States v. de Jesus-Rios*, 990 F.2d 672, 677 (1st Cir. 1993)).

### 1.  Unnecessarily Suggestive

In determining whether an array is unnecessarily suggestive, the Court must consider both the suggestiveness of the array and whether there was a good reason for law enforcement's failure to resort to less suggestive procedures. *See Holliday*, 457 F.3d at 125. The array at issue was comprised of six photographs. Among the six photographs put before the witnesses, only the Defendant's photo depicted an individual with long dreadlocks and wearing a white tank top, the very features of the suspect's appearance described to the police by the witnesses prior to the apprehension of the Defendant. While the other five men were also black males roughly the same age as the Defendant, their dreadlocks were significantly shorter and less thick than the Defendant's. In addition, only the Defendant was wearing a white tank top. Two of the other men wore white t-shirts, and three of the men wore orange shirts, presumably prison-issued.

The Lewiston police were investigating an armed individual who fired two shots into an occupied apartment in a residential neighborhood. Although the crime was serious, the police were fairly confident that the Defendant was the shooter, and he was in their custody on an outstanding warrant. While the police understandably wanted to confirm their suspicions as soon as possible with the witness identifications, they did not have the same time pressures as are present

when a dangerous suspect is at large or a victim is dying. Detective Clifford, the officer who put together the line-up, testified that he had trouble finding photographs of other individuals with long dreadlocks and he was limited by the small size of the database. There was no testimony as to why he could not have gone outside of his limited database for pictures.[6]

In an unpublished opinion and using the highly deferential standard of review for habeas cases, the First Circuit assessed the constitutionality of a photo array which contained only one light-haired suspect among five dark-haired individuals. *Johnson v. Dickhaut*, 308 F. App'x 454 (1st Cir. 2009).  The victim had previously described the suspect as having strawberry blond hair. Pointing out that some identifications are single photographs or single show-ups, the Court stated that there is "no requirement to include a certain number of 'filler' photographs in an array." *Id.* at 457 (citing *Brathwaite*, 432 U.S. at 117). *Compare United States v. Fletcher*, 121 F.3d 187, 194 (5th Cir. 1997) (six-photo array in which the defendant was the only individual wearing a suit and tie as described by the witness was not impermissibly suggestive), *abrogated on other grounds as recognized by United States v. Robinson,* 367 F.3d 278, 286 n. 11 (5th Cir. 2004), *with United States v. El Tayib*, 88 F.3d 157, 166 (2d Cir. 1996) ("One would think that if a suspect is described only in terms of one characteristic, the filler photos in an array would also portray people having that characteristic. Otherwise, there may be no real

---

[6]     The Government suggested at oral argument that the background for non-local photos would not have been the same as the backgrounds for the six photos featured in the array, or that other photos might contain placards identifying the photo as having been taken out-of-state. The photos in this array contain either an undifferentiated white background or a white concrete-block background and the individuals are depicted without placards.

identification, just a witness with the wit to suppose that the one suspect with the salient characteristic must be the person suspected by the authorities.")

The First Circuit has noted that the duty to match highly unusual aspects of a suspect's appearance is limited: "The police are not required to search for identical twins.'" *Holliday*, 457 F.3d at 126 n.5 (quoting *Wright v. State,* 175 N.W.2d 646, 652 (Wis. 1970)). In *Holliday* the defendant had such unusual facial pigmentation that it would have been nearly impossible to find filler photographs which were similar to the suspect. *Holliday,* 457 F.3d at 126.

In this case, because the witnesses described certain features of a suspect and were presented with only one picture containing those specific characteristics, the Court finds that the array was suggestive. Long dreadlocks, unlike unique facial pigmentation, are not so unusual that images of individuals with them could not have been found. With today's technology, it should be possible for police departments to reach outside of the confines of their own limited databases and get images from other sources, either through the internet or other police databases.[7] Furthermore, the police could have cropped out the Defendant's white tank top or photographed the Defendant in a different shirt. Also, since the prime suspect was in custody, the police had enough time to put together a less suggestive array. Because the Defendant has met its burden of establishing that the procedure was unnecessarily suggestive, the Court will proceed to assess whether the identifications were nevertheless reliable.

---

[7]     As to the Government's argument that many mug shots show arrestees with placards that identify the department, it should be possible to crop or block out the text of a placard with inexpensive photograph editing software.

### 2. Reliability

To determine whether the witnesses' identifications were reliable, the Court considers the factors described in *Biggers*: the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. *United States v. Bouthot*, 878 F.2d 1506, 1514 (1st Cir. 1989), (citing *Biggers*, 409 U.S. at 199-200), *abrogated on other grounds by Perry v. New Hampshire,* 132 S. Ct. 716 (2012). The government bears the burden in this part of the analysis, *Jones*, 689 F.3d at 17 (citing *Brathwaite*, 432 U.S. at 109-14). The Court proceeds separately as to each witness.

### a. <u>Ronald Coleman</u>

Coleman was in his apartment on the first floor of the Walnut Street apartment building. It was very early in the morning, and he had the television on and was drinking coffee trying to wake up. Coleman heard a verbal altercation outside. He looked out but did not see anything and went on about his business. Shortly thereafter, a gunshot grabbed his attention. Coleman looked out the window in time to see a second shot fired into his next-door neighbor's apartment. Coleman testified that although it was still dark outside, he was able to see a black man fire the gun, turn, and walk away from the apartment. Coleman testified that he saw the shooter for only seconds, and he had no opportunity to view the shooter's face. Coleman described the shooter as a black man of approximately his own height,

build, and age with long braids wearing a white tank top. To the extent that he could see, Coleman was an attentive witness. He was particularly attentive to the type of firearm used.

Five months had passed between the shooting and the Government's presentation of the array to Coleman. Although his condition was not critical, Coleman was in the hospital at the time the police showed him the lineup. Coleman evinced certainty in his choice of the Defendant when he was presented with the lineup. This apparent certainty, however, was undermined by Coleman's assertions at the suppression hearing that he picked the Defendant out of the lineup because he was the only one who had long braids. Coleman testified that he understood that the police had already arrested the shooter, and he appeared to infer that, therefore, the shooter was in the lineup. Coleman testified at the suppression hearing that he would not be able to identify the shooter if he saw him again, and that he picked the Defendant's photo because he did not want to be "bad."

Under the totality of the circumstances, Coleman's out-of-court identification was not reliable and must be suppressed. Because the out-of-court identification would taint any in-court identification, the Court will not allow Coleman to make an in-court identification of the Defendant at trial.

### b. **Adam Dennis**

Dennis did not witness the shooting, but he was involved in the altercation with the man sleeping on Cloutier's porch shortly before the shooting. The man grew angry during the altercation, and Dennis observed him at close range, face-to-

face, for five to ten minutes. At one point, Dennis followed the man through a well-lit hall out to the front entrance of the building. Although Dennis had been drinking beer throughout the evening, there was no indication that he was significantly impaired, and the fact that Dennis and the man argued was likely to have heightened Dennis's attention.  Dennis described the man with whom he argued as a large black man with long dreadlocks wearing pants, a shirt, and a hat. Dennis was shown the lineup the same day as the altercation, and he was certain when he selected the Defendant's photograph that he was the man with whom he had argued. Altogether, there are enough indicia of reliability to admit Dennis's identification into evidence.

### c.  <u>Alan Roy</u>

Roy observed the man arguing with Dennis for about fifteen minutes. Although some of that argument took place on the dark back porch, Roy testified that the man walked right by him when he passed through the lighted hallway. Roy testified that he had previously seen the man around the city, although he did not know him by name. Roy testified that a while after the man had left, Roy heard yelling outside the apartment and that he went to his third floor apartment window to see what was going on. Roy testified that he saw the same person who had been sleeping on his mother's porch and who had been arguing with Dennis. Roy, who wanted nothing to do with the situation, turned away from the window and moments later heard shots.

As far as his degree of attention, Roy acknowledged that he had consumed seven or eight beers over the course of the evening,[8] and he also testified that he was having his own argument with his girlfriend during Dennis's altercation with the suspect. Roy described the man as a black male with dreadlocks.

As Officer St. Laurent started to show the photographs in the array, Roy identified the first photograph set down, which was of another individual. Officer St. Laurent told Roy to wait until all the photos were displayed, and only then did Roy point to the Defendant's picture. Roy said he ultimately settled on the Defendant's photo because he recognized the Defendant's face. Roy affirmed that the Defendant was the man he had seen around town, the individual he had seen on his mother's porch, and the person who came back to his mother's apartment just before the shooting. Roy was shown the photo array the afternoon following the incident while his memory of the events was still fresh.

Although Roy presents a close call, the Court finds that his identification does not give rise to a substantial likelihood of irreparable misidentification. The Court keeps in mind the First Circuit's admonition that "it is only in extraordinary cases that identification evidence should be withheld from the jury," and concludes that Roy's identification has enough indicia of reliability that it should be presented to the jury. *Jones*, 689 F.3d at 18. Once subjected to the harsh light of cross-examination, the jury can best determine the weight Roy's identification should be accorded.

---

[8]     Roy testified that he and Dennis picked up a 12-pack and a 40-ounce after they finished work and spent the evening drinking. Although Roy estimated the time of the altercation to be around 11:00 p.m., Dennis and Coleman both testified that the time was around 4:00 a.m..

### d.  Nancy Cote

As Cote herself was quick to point out, she did not see anything on the night of August 19, 2011. She was shown the photo array solely to confirm that the individual the Government had identified as the Defendant was the man Cote knew as "Jamal." The Government has represented that her "identification" is not going to be used at trial, and, consequently, the Court need not address its reliability.

### CONCLUSION

For the reasons stated, the Defendant's motion to suppress the firearm recovered by the police is **DENIED**. Defendant's motion to suppress the witness identification of Ronald Coleman is **GRANTED**, but his motion to suppress the witness identification of Adam Dennis and Alan Roy are **DENIED**.


**SO ORDERED**.

/s/ Nancy Torresen
United States District Judge


Dated this 5th day of February, 2013.

21